494 P.2d 1324

**Nunzio V. MICUCCI, Petitioner,**

v.

**The INDUSTRIAL COMMISSION of Arizona, Respondent,**

**Knoell Brothers Construction Company, Inc., Respondent Employer,**

**State Compensation Fund, Respondent Carrier.**

**No. 10780–PR.**

Supreme Court of Arizona,
In Banc.

March 23, 1972.

Rehearing Denied May 2, 1972.

Spencer K. Johnston, Phoenix, for petitioner.

William C. Wahl, Jr., Chief Counsel, The Industrial Comm. of Ariz., Phoenix, for respondent.

Robert K. Park, Chief Counsel, State Compensation Fund by Cecil A. Edwards, Jr., Phoenix, for respondent carrier.

LOCKWOOD, Justice.

This matter is before us on a petition for review of the decision of the Court of Appeals reversing the award of the Industrial Commission which denied permanent disability to petitioner Nunzio V. Micucci. Opinion of the Court of Appeals, 16 Ariz. App. 143, 492 P.2d 23 (1972), vacated.

On April 10, 1967 petitioner, a carpenter, was injured when he fell eight feet to the

ground. His claim was accepted for medical benefits and temporary disability. He continued to receive compensation until the final report of a consultation group of doctors was made on November 5, 1969. That report states in pertinent part:

"This patient continues to have myriad functional complaints with only very minimal abnormal objective findings at times. The consultants can see no indications for any further medical examinations or treatments as related to the injury of 4–10–67.

"In our opinion this patient's case can now be closed without any permanent disability attributable to that injury.

"We recognize that the patient still continues to have symptoms which seem significantly disabling to him to perform his regular duties as a carpenter. We are in agreement with the fact that he will be limited in his ability to perform that type of work. We do, however, feel that he is able to be gainfully employed and that it is necessary for him to remain employed for his future ultimate general rehabilitation.

"It is our opinion that this patient may well have an early underlying degenerative joint disease which is causing the persistence of his symptoms and the continuation of the number of joint complaints that he has. This cannot, however, be proven clinically at this time, and this is not causally related to the injury of 4–10–67."

During this period of two and one half years, between the time of the injury of April 10, 1967, and the final report of the consultation group of November 5, 1969, petitioner had been examined by various doctors. Dr. Buford Gregory, an osteopath, saw petitioner immediately after the accident and then again in April of 1970. He was of the opinion that petitioner had a "pre-existing degenerative disk disease complicated by the gouty condition and by the fall."

Dr. DeWitt W. England testified, after having examined petitioner, that he believed that petitioner did not have osteoarthritis. Dr. England last examined petitioner in May of 1968.

Dr. Daniel J. Potter, an internist, examined petitioner from July of 1968 to October of 1969. It was his impression, taken from another doctor's description of the x-rays, that petitioner had osteoarthritis. He did not know, however, if the disease was causally related to the injury.

Dr. Thomas Henry Taber, an orthopedic specialist, examined petitioner forty to forty-five times from the time of the injury until the group consultation report which he participated in. He testified that initially he "thought that [petitioner's] symptoms were related to a lumbo-sacral sprain and strain to both knees and both feet as a result of the injury." He testified however, that he had reached the conclusion that petitioner's present symptoms were not the product of the injury but were due to osteoarthritis. He was also of the opinion that the injury did not aggravate this disease.

It is essential to reiterate the governing principles for appellate review of Industrial Commission awards. This Court will consider the evidence in a light most favorable to sustaining the award and the Commission's findings must be sustained if reasonably supported by the evidence. Valdon v. Industrial Comm., 103 Ariz. 547, 447 P.2d 239 (1968); In Estate of Bedwell, 104 Ariz. 443, 454 P.2d 985 (1969). Furthermore, the Commission's findings will not be disturbed when the evidence is in conflict. Malinski v. Industrial Comm., 103 Ariz. 213, 439 P.2d 485 (1968). Finally, this court will not negate a fact finding of the Commission unless the evidence is such that there is but one possible inference to be drawn. Gronowski v. Industrial Comm., 81 Ariz. 363, 306 P.2d 285 (1957).

The sole question in this case is whether there was a reasonable basis in the evidence from which the Commission could have reached its conclusion. The record shows a conflict in the medical evidence. The testimony of Dr. Taber in

combination with the report of the consultation group, supported the findings of the Commission in making its decision. We are of the opinion that Dr. Taber's final conclusion and that of the consultation group, that petitioner's symptoms were not related to the injury, was not fraught with uncertainty.

Dr. Taber was propounded numerous times with the question of whether he was of the opinion that petitioner's present symptoms were caused by the injury of April 10, 1967. He persistently answered that in his opinion petitioner's symptoms were caused by osteoarthritis. With exacting detail he outlined his diagnosis of the cause of petitioner's condition over the two and one-half year period of time that he attended him.

"Q. As of 12–13–67 was there in your opinion, based on a reasonable medical probability, still a relationship between this accident of 4–10–67 and his condition at this time?

"A. Yes, to some degree.

"Q. So as of that particular date, May 28, 1969, you felt that, based on reasonable medical probability, there was still a connection between his complaints and the accident of 4–10–67; is that correct?

"A. Perhaps, yes."

Dr. Taber stated that petitioner was referred to Dr. Potter because Dr. Taber was not getting satisfaction out of the reports from Dr. England. Dr. Potter "concurred that there might possibly be some early degenerative joint disease of a generalized nature. His treatment was directed primarily along medical supportive lines and not specifically related to the industrial injury." Dr. Taber continued:

"Q. I take it that up to November 5, 1969, you had related Mr. Micucci's symptoms and conditions as being causally related to the accident of 4–10–67; is that right?

"A. Yes, I think a number of his symptoms remained persistently the same throughout the entire course of the time

that I saw him. His symptoms were initially caused by his injury of April '67. If they didn't change, I think it is reasonable to say the symptoms were probably causally related to the injury itself. That's just symptoms, however."

Dr. Taber concluded:

"In November of 1969 the effects of the injury would be considered over with.

\* \* \* \* \* \*

"He had apparently a proven diagnosis of gout. He had been diagnosed as having Boeck's sarcoid a number of years previously, and it is my opinion that he probably had an old degenerative joint disease."

When asked upon what specifically he based his recent conclusion, he answered:

"First of all, it was only our impression that this is probably what he has. It had been mine a good while before, and I had discussed it with him. The main thing that makes this suspiciously likely as a diagnosis is that on his x-rays of his dorsal spine \* \* \* his x-rays have begun to show the typical change of a degenerative joint disease.

"This is one of the commonest places for this particular condition to become manifest in the body even asymptomatically. By that, I mean often times just taking a chest film of a patient, we will see these beginning degenerative changes even though the patient has never had symptoms."

Dr. Taber also explained how the disease is detected:

"It shows up usually as beginning calcification in the ligaments at the very borders of the vertebrae, so that very shortly thereafter—that's not quite right. Within a year or two after symptoms develop, actual calcification will be seen in the ligaments. This is the so-called osteophyte.

"Q. But the x-rays you saw in '67, you only saw minimal changes; is that right?

"A. Yes.

"Q. Is that the reason at that time you related his symptoms to the accident?

"A. In August—

"Q. In August of '67 you didn't say it was osteoarthritis at that time. You said it was the accident. Is that correct?

"A. That's correct.

"Q. What causes this osteoarthritis?

"A. Medical science doesn't know for certain. There are several theories as to what may cause it. It is usually attributed to a degenerative process associated with aging. It does not, however, mean that the patient has to be old to have the disease. It just means that sometime in adult life bone changes begin, and then the diagnosis of osteoarthritis or degenerative arthritis is established."

When asked whether osteoarthritis could be "triggered" by trauma Dr. Taber answered:

"There is no medically documented data to show that osteoarthritis is due to trauma. The cause for osteoarthritis still remains unknown. The most likely theory for osteoarthritis is that it is probably a metabolic situation."

Dr. Taber did not use precisely the language : "reasonable medical certainty" in making his conclusion that petitioner's symptoms were not related to the injury. But to require that doctors specifically use this language would be hypertechnical. We believe that it is important only that it be gleaned from a reading from the entire testimony that the doctor based his opinion upon reasonable medical certainty. Concomitantly, some uncertainty is characteristic of all medical testimony:

"It is a common experience of compensation and personal injury lawyers to find that the more distinguished a medical witness is, the more tentative and qualified are his statements on the witness stand. * * * The weight of such testimony, however, should not be too sharply discounted because of the disposition of the highly-trained scientific mind to refrain from unqualified statements or opinions on such matters as causation." 3 Larson's Workmen's Compensation Law, § 80.32 at 289.

We conclude that Dr. Taber's testimony, taken together with the report of the consultation group, provides reasonable medical certainty that petitioner's symptoms and condition are no longer causally related to the industrial accident of April 10, 1967.

The decision of the Court of Appeals, 16 Ariz.App. 143, 492 P.2d 23 (1972), is vacated and the award of the Industrial Commission is affirmed.

HAYS, C. J., CAMERON, V. C. J., and STRUCKMEYER and HOLOHAN, JJ., concur.